# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0574-24

M.F.Y.,

     Plaintiff-Respondent,

v.

D.T.Y.,

     Defendant-Appellant.

_____

     Argued January 15, 2026 – Decided February 2, 2026

     Before Judges Mawla and Puglisi.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FV-19-0602-24.

     Chris H. Colabella argued the cause for appellant (Gruber, Colabella, Thompson, Hiben & Montella, attorneys; Chris H. Colabella, of counsel and on the briefs; Kristen C. Montella, on the briefs).

     M.F.Y., respondent, argued the cause on respondent's behalf.

PER CURIAM

Defendant D.T.Y.[1] appeals from a September 20, 2024 final restraining order (FRO) entered against him in favor of plaintiff M.F.Y. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We reverse for the reasons expressed in this opinion.

## I.

## A.

We take the facts from the record of the parties' eight-day trial of dueling domestic violence complaints. The parties resided together for approximately five years and were married for four of those years. Both testified they got married for love but also so defendant could be on plaintiff's health insurance. Defendant is sixty-five years of age. He suffered from an undiagnosed illness which was incorrectly believed to be cancer. His condition caused his kidneys to bleed and left him debilitated on occasion. He previously owned a furniture company but lived off his social security and private disability insurance. Plaintiff worked as a Catholic school teacher.

There were arguments and altercations throughout the marriage, ultimately leading to the parties residing in separate bedroom suites in the marital residence beginning in September 2022. The parties separated several

---

[1] We use initials pursuant to Rule 1:38-3(d)(9) and (10).

times during their short marriage and defendant filed a divorce complaint in December 2022. Although the parties shared no children and had a short-term marriage, the divorce complaint set off litigation revolving around occupancy of the marital residence.

On February 24, 2023, defendant went to the hospital for kidney surgery. He installed cameras in his bedroom. While he was in the hospital, the cameras recorded plaintiff entering his bedroom, going through his belongings, and then disabling the cameras. On March 4, 2023, defendant was released from the hospital and returned to the marital residence to retrieve some belongings because he planned to recuperate at his son's home. He plugged in the cameras, which recorded plaintiff disabling them again.

On March 7, 2023, defendant returned to the marital residence and discovered plaintiff had "ransacked" his bedroom. The remote to his adjustable bed was missing and the bed was placed into an upright position, making it impossible to use for sleep. Defendant's Amazon Alexa device was missing along with other electronics. He returned the next day and discovered the storm door to the marital residence was locked and could only be opened from the inside. Defendant later discovered the Alexa device, bed remote, and other items were placed behind a board in a barn on the property.

3

On March 10, 2023, defendant moved plaintiff's items from his bedroom into hers and then installed a lock on his bedroom door. He also removed the lock from the storm door. Defendant was generally handy around the house but was particularly savvy with locks because of his former furniture business. He owned lock-picking and other tools prior to the marriage.

Plaintiff returned home and called the police, who arrived and advised both parties to stay away from each other. Defendant returned to his room and discovered the internet was disconnected. The modem was gone, and the internet would occasionally return, seemingly at plaintiff's whim.

On March 13, 2023, defendant came home and went to his bedroom. Plaintiff appeared and told him he could not have a lock on his bedroom door. As defendant rushed into his room, plaintiff stuck her foot in the door, preventing him from closing it. Defendant recorded the confrontation, which was played at trial. He ultimately called 9-1-1 and obtained a temporary restraining order (TRO) against plaintiff. She also obtained one against him.

On April 13, 2023, the parties agreed to mutual dismissals of their TROs. That day, the court entered a consent order in the divorce proceeding memorializing the dismissals in favor of civil restraints. The consent order stipulated both parties had a right to be in the marital residence. It delineated

4

each could occupy and lock their respective bedrooms on the second floor. Defendant agreed to maintain the lawn, care for the parties' dog, and not have or allow any guns at the home. Plaintiff was responsible for maintaining the flower bed, a pond, and the chickens. The consent order contained other provisions detailing the parties' rights and responsibilities vis-à-vis the property, which we need not repeat here. Rather than settle the parties' disputes and bring a modicum of order to their affairs, problems continued.

Following the consent order, plaintiff refused to sleep in the marital residence and instead would occasionally come to the home for an hour or so. This left defendant alone at the residence, which was located on a wooded property. Although defendant gave his son the four guns he owned, given plaintiff's absence and that there were thefts and bear encounters in the neighborhood, defendant brought three guns back for self-protection.

Defendant was also required to provide plaintiff access to a computer to obtain her files. Rather than doing that, he provided plaintiff with a cloud-link to her files and permitted her to migrate her emails from an address maintained by his company's website to her own email account. The consent order prohibited the parties from disconnecting the internet, yet plaintiff disconnected and removed the modem from defendant's bedroom and obtained her own

5

service. Plaintiff also took the keys to the mechanical farm equipment even though the parties agreed they would each have access to equipment to maintain the property. Defendant traded in an old marital vehicle for a newer one, which touched off a dissipation claim. The parties also disputed the marital nature of tools defendant claimed were from his business and owned prior to the marriage. The parties were unable to cooperate regarding the payment of expenses.

Plaintiff accused defendant of surveilling her because he maintained cameras in his bedroom with one pointing from a window onto the driveway. Without evidence, she also claimed he was using the Alexa device to surveil her.

Between March 13, 2023 and February 12, 2024, plaintiff appeared at the marital residence at least twenty-five times. The parties had little to no contact during this period.

On February 7, 2024, plaintiff filed another domestic violence complaint alleging defendant committed harassment and criminal mischief. She asserted three incidents of domestic violence: 1) defendant passed plaintiff on a stairway in the marital residence; 2) he yelled at plaintiff and her friend to shut up; and 3) he drove his vehicle close to them when they were walking the dog on the driveway.

A-0574-24

The complaint detailed defendant's conduct mostly occurred in and around the marital residence, and involved his violation of the consent order, including surveilling her, locking access to parts of the home, blocking the driveway with his vehicle, accessing her email, and engaging in other conduct, which alarmed plaintiff. She claimed there were cameras with blinking lights in the home after police removed defendant.

On April 12, 2024, the matter was tried and the trial judge concluded defendant's conduct did not amount to domestic violence. The same day, the judge entered an order in the matrimonial matter granting plaintiff exclusive possession of the marital residence and defendant thirty minutes to remove his belongings under police escort.

On April 24, 2024, following a conference with the parties' attorneys, a different judge entered an order, which created a nesting arrangement. The relevant part of the order read as follows:

> The parties are to operate on a "[two] week on, [two] week off" arrangement with respect to the marital residence, with . . . [defendant]'s time to start on April 30, 2024 at 6:00 p.m. and to run to May 14, 2024 at noon. The [six-]hour buffer is designed to ensure that the parties will not have any contact with one another.

The order also contained a provision requiring defendant to "remove any firearms from the premises."

7

On April 30, 2024, defendant returned for the first time since February 12, 2024. He could not access the garage because the code was changed. The family dog and internet modem were gone so defendant messaged plaintiff, but she did not respond. The doorframe to defendant's bedroom was damaged from forced entry, and the bed was moved to another room. Defendant's exercise equipment was replaced by plaintiff's vanity. A television was missing, defendant's belongings were placed in a corner, and his toiletries moved to a wastebasket.

Defendant responded by placing items plaintiff had put in the bathroom into her garbage pail and moved the pail to her room. He returned his bedroom to its former state and photographed the condition of the residence. During defendant's initial nesting period, he moved items he believed were premarital and removed items he purchased post-complaint.

On May 13, 2024, plaintiff entered the marital residence to begin her stay. She discovered defendant removed several of her belongings from the home, broken or disabled some of her items, installed a lock on a bedroom door, and put a note on the broken door frame asking her to have her boyfriend fix it.

On May 28, 2024, defendant checked out of his temporary stay residence. He assumed plaintiff had vacated the marital residence and was at work because it was the middle of the day. Defendant went to the residence around 1:00 p.m.

A-0574-24

and saw plaintiff had not moved out because her belongings and the dog were present. He left around 2:00 p.m. to go to his storage unit and returned around 3:30 p.m. Defendant pulled to the top of the marital home's long driveway, saw plaintiff's vehicle at the residence, and then left to drive around until she was gone. When he returned at 4:00 p.m., plaintiff and the dog were gone, but the dog's food bowl was still present, signaling she intended to return. Defendant decided to go to the grocery store but before he left, he placed the items he had brought into a closet and photographed them. On the way back from the grocery store, the parties passed each other in their vehicles. Plaintiff claimed it was not happenstance and defendant was surveilling her from a location over a mile away from the home.

Between February 12 and May 28, 2024, it was undisputed the parties had no contact other than exchanging four emails. On April 30, 2024, defendant emailed plaintiff about the missing modem and dog, followed by another email about the dog. On May 2, 2024, plaintiff emailed defendant about scheduling an appraiser to come to the marital residence during his nesting period. Defendant emailed plaintiff regarding a friend's trailer.

9

On May 29, 2024, plaintiff filed another domestic violence complaint. Police removed defendant from the residence, giving him only twenty minutes to gather his belongings.

Defendant responded with his own complaint. Both parties subsequently amended their respective complaints. Plaintiff's amended complaint, which is the subject of this appeal, alleged predicate acts of criminal mischief, criminal trespass, stalking, and harassment.

Plaintiff asserted defendant had been to the marital residence during the buffer period as her residency in the home was about to end on May 28, 2024. She claimed he installed a lock on a closet door, preventing access to her belongings. As she was leaving the residence, defendant drove towards her.

Plaintiff's complaint alleged a history of similar conduct "by def[endant] to harass and control" her. She reiterated defendant used the Alexa device to "'drop in' and monitor" her and turn off lights to "frighten and harass" her. On April 5, 2020, defendant discarded items belonging to plaintiff's children, including her deceased son. Defendant demeaned plaintiff by calling her crazy and making similar comments to friends and family. He controlled the finances, including her assets and online access to her accounts. The conduct escalated

10

after the parties saw a marriage counselor because defendant used information he learned during counseling sessions to make plaintiff feel unsafe.

Plaintiff alleged defendant purchased a handgun and continued to bring guns onto the property, despite the consent order barring them. In March 2023, he damaged her computer and stated he would be sending her employer an email with information, which could cause her to lose her job. Plaintiff asserted defendant moved her belongings from the master bedroom and placed a lock on her door on March 13, 2023. When she tried to enter the room, he shut the door on her foot. Plaintiff claimed defendant's conduct caused her physical harm of "weight loss, loss of sleep[,] and quality of life."

Plaintiff's complaint alleged a campaign by defendant to control and harass her, including opening her mail, cashing medical insurance reimbursement checks written to her, establishing an internet account in February 2024 even though he had been removed from the house on a prior TRO, and mistreating their dog and other farm animals. Plaintiff contended defendant surveilled her using cameras set up in the master bedroom, deleted her email account, told her he wanted to be the sole beneficiary of her life insurance policy, and left bullets and gun clips in hidden drawers in the bedroom nightstands.

A-0574-24

At trial, plaintiff testified consistently with the allegations in her complaint. She took a video and pictures of how she left the house before April 30, 2024, when defendant began his stay. When she returned two weeks later, many of her things were broken or missing, including pictures of her children. She claimed defendant took the remote control for the bed, left the bed in an upright position, and removed wires from her stereo. The bed's position prevented plaintiff from sleeping and made her afraid to sleep in the room. She claimed defendant removed televisions from the house. Plaintiff intended the marital residence to be her home forever, and knowing this, defendant did everything to make her feel uncomfortable, including letting it fall into disrepair.

The final day of plaintiff's nesting period was May 28, 2024. She left the home late that day because she did not get off work until 3:00 p.m. When she returned, she found a closet door was locked. She felt things were not right and went to get a friend, returning around 5:00 p.m. As plaintiff left that night, she noticed defendant driving towards the house prior to the beginning of his nesting period in violation of the court order.

Plaintiff testified she feared for her life because defendant had firearms. She had not lived in the house for some time and returned to find defendant's

truck parked parallel to the home, blocking her parking spot. Plaintiff asserted defendant locked her out of their personal computer and deleted her email account, which contained evidence she could use in their divorce proceedings. She believed defendant bugged her phone and her car.

In March 2023, defendant lived alone in the master bedroom and kept the door locked. Plaintiff claimed his behavior was bizarre. In addition to cashing plaintiff's health insurance reimbursement checks, defendant made several of her financial accounts paperless, preventing her from receiving her account information. As a result, whenever the parties separated, plaintiff was unable to access the information.

Plaintiff recounted various communications she had with defendant about gaining access to her personal information. She also testified about defendant moving her belongings around the house, damaging them, and locking her out of the bedroom.

In July 2023, plaintiff was talking with a friend at home, when defendant yelled for them to shut up. She alleged defendant pinned her, her friend, and the dog on an embankment by driving close to them when he was driving up the driveway. Defendant sent plaintiff email communications quoting scripture and

13

calling her a sinner. Plaintiff testified this made her feel uneasy because it felt like he was guilt-tripping her.

Plaintiff claimed defendant unwired and disabled her stereo. Other acts of alleged domestic violence included defendant placing cameras in the bedroom, adding a lock on the bedroom door, and installing a driveway sensor. Plaintiff believed his purpose was to make her feel violated, uncomfortable, and constantly watched. She had her car checked for bugs and hired a private investigator to inspect her phone for a listening device.

Defendant knew of plaintiff's love for her animals. She testified how distressed she was when she returned home following an earlier TRO to find the dog had no water and the chickens malnourished and eating each other. Plaintiff claimed defendant's actions were psychological abuse.

Plaintiff testified defendant took her money, even though he had substantial disability and social security income. She explained the weapons and ammunition in the home made her believe defendant was either trying to drive her away or he was going to claim self-defense and kill her.

On cross-examination, plaintiff testified she knew defendant liked to shoot guns and once went shooting with him, but it made her nervous that there

14

were guns in the house. She claimed this is why she did not live in the home between February 2023 and February 2024.

Plaintiff admitted she remained in the marital residence past her allowed hours on May 28, 2024, but claimed the buffer time did not mean she was excluded from being at the marital home after her time ended at 12:00 p.m. She interpreted the times in the nesting provision of the order to mean the person who was leaving had a buffer time to prepare to leave the home.

Plaintiff conceded defendant was not responsible for caring for the chickens. She acknowledged she moved property within the home but was unsure if she removed any marital property from the home. Although plaintiff accused defendant of leaving the bed in an upright position, she had asthma which required her to sleep in an upright position.

Plaintiff admitted defendant was allowed to live in the master bedroom with a lock on the door under the March 2023 consent order. She removed items during her nesting period, including an Amazon Fire TV Stick and a modem before the consent order granted her exclusive occupancy of the home. Contrary to her initial claims, plaintiff agreed defendant did not take her family photos but instead removed them from the mantel or turned them over.

A-0574-24

Plaintiff conceded the parties had no physical or telephone contact. She testified they communicated with each other in writing approximately four times between February and May 2024. However, she claimed defendant communicated with her by other means, specifically when he: drove by her on his way to the house on May 28, 2024; took her yogurt; and added a vehicle he purchased onto her insurance policy.

On direct, plaintiff testified defendant disabled her grandfather clock to annoy her, but on cross-examination conceded she had no evidence it was him. Although she claimed defendant blocked her in the driveway, she admitted the driveway was circular and had a separate entrance and exit.

In February 2024, plaintiff found cameras when she returned to the house and claimed they were in her room, but she acknowledged the room belonged to defendant prior to that time. Plaintiff conceded she found no other cameras or listening devices in the home. Although she asserted she was surveilled throughout the marriage, she had no proof.

Plaintiff testified the bullets she found in the master bedroom were in a secret drawer, which she always knew existed. She conceded the TRO prohibited defendant from keeping firearms but not bullets. Plaintiff also admitted the closet defendant locked was his during the marriage.

16

On plaintiff's re-direct testimony, she claimed she found an article in the trash about a court decision allowing religious schools to require teachers to teach religious materials, with a highlighted portion noting a teacher was fired for having a relationship outside of marriage. She believed defendant left the article in the trash for her to find because he wanted to blackmail her by telling her employer she was in an extramarital relationship.

Plaintiff called her long-time friend as her final witness. The friend corroborated the instance when she and plaintiff visited the marital residence and defendant "screamed shut up very intensely, [and] slammed the door closed." She also recounted the incident when defendant forced them off to the side of the driveway when he drove onto the property. She testified defendant was generally aggressive inside the home.

Defendant's testimony was detailed and addressed every claim raised by plaintiff. He corroborated plaintiff's testimony the marriage was marked by several separations. Defendant testified the parties had only two in-person contacts and no other email or text contacts between February and April 2024.

Defendant explained his conduct on May 28, 2024. He noted the parties passed each other on the road. Contrary to plaintiff's testimony, he contended he was not stopped on the side of the road but was waiting at a stop sign when

17

he saw plaintiff. Defendant asserted he took his personal property from the home because he needed access to it and was worried plaintiff would take it, but he did not remove marital property.

Defendant also denied running plaintiff off the driveway. He drove as slow and as far to one side of the driveway as possible to avoid plaintiff. Defendant did not recall telling plaintiff and her friend to shut up.

Defendant testified the 2023 consent order granted him sole occupancy of the master bedroom and allowed him to place a lock on the door. Despite the consent order's prohibition against firearms on the property, defendant conceded he brought several of his firearms back to the home as he felt unsafe being there alone. Plaintiff had no knowledge he brought the weapons back to the home.

Defendant testified he took care of the chickens and maintained the yard. He placed two cameras on the property, both of which were in his bedroom. Defendant explained the blinking green light on his cameras, which plaintiff believed was evidence he was watching her, were messages that a camera "has fallen offline and is attempting to reconnect." He denied using the Alexa to eavesdrop on plaintiff.

Defendant was hospitalized due to a health emergency in February 2023. He installed a camera to monitor his room during his hospitalization. Defendant

played footage from the camera, which captured plaintiff entering his room, going through his belongings, and disconnecting his electronics. When defendant returned from the hospital, he removed plaintiff's belongings from his room and placed them in her room so she had access to them. Afterwards, he placed a lock on the door.

Defendant denied shutting the door to his room on plaintiff's foot on March 13, 2023. He claimed plaintiff ambushed and told him he could not place a lock on the home. Defendant explained he attempted to enter his room and close the door, but plaintiff stuck her foot in the door. The audio recording evinced him asking plaintiff to move her foot. When she refused, he said he would copyright the videos he took of her entering his room. The audio revealed the parties continued to bicker and ultimately ended because defendant called 9-1-1.

Defendant denied destroying any of plaintiff's property or removing her photographs. In March 2023, he disconnected the stereo when he was recuperating from his health issues because plaintiff was playing her music loudly. The April 2023 consent order contained a provision prohibiting either party from playing loud music.

A-0574-24

Defendant denied controlling the parties' finances. He noted their account had online access and was managed by a financial advisor, who plaintiff could have contacted at any time. Defendant locked the family computer because plaintiff tried to cut the lock on it and remove it from the marital residence. Defendant's personal computer contained information from his former business and did not have plaintiff's personal information.

Defendant denied mistreating the dog. It was his companion, and he explained how he was involved in the adoption process. He pointed out he could not have blocked the driveway given its circular nature. The sensor on the driveway was to alert if there was anyone approaching. Defendant did not tell plaintiff about the sensor because she was no longer living in the home when he installed it.

Defendant denied calling plaintiff a sinner; rather her conduct was sinful. He denied unilaterally cashing plaintiff's checks, noting the checks were for his medical treatment and the parties' practice was to deposit them into their joint account.

On cross-examination, defendant conceded there was no court order granting him exclusive possession of his bedroom when plaintiff put her foot in the door. He admitted raising his voice but claimed he was startled because

plaintiff accosted him as soon as he walked into the house and "she was laughing and very calm." Defendant also admitted removing the marital patio furniture because plaintiff had taken money from their joint account. His truck was also marital property, but it was nearly twenty years old and sold for just $1,000; he conceded he owed plaintiff a $500 credit. Despite court orders barring him from keeping firearms at the home, he felt he was allowed to have them when plaintiff did not move back to the home in 2023.

Defendant could not remember why he highlighted a portion of the article about a teacher being fired for having premarital sex, but noted he was interested in it because plaintiff was a Catholic school teacher. He denied trying to send plaintiff a message by placing the article in the trash, and he had no opportunity to discard the trash because police only gave him approximately twenty minutes to vacate the property. The note he left on the bedroom door for plaintiff was "[t]o remind her that this frame is busted, you busted it, and you should fix it."

C.

The trial judge made oral findings of fact and conclusions of law. She found plaintiff and her friend testified credibly. Defendant was "overall credible," but the judge questioned "some of the instances of lack of memory he

21

had on cross[-]examination."  She also questioned "the number of reasons or excuses . . . he gave in response to the allegations of his conduct."

The judge recounted the alleged domestic violence occurred in and around the marital residence and was driven by the fact "both parties indicated they didn't believe [the timeframes in the April 24, 2024 order] were clear."  Based on defendant's testimony, the judge found "it reasonable that [defendant] believed that he had a right . . . to bring his belongings" to the marital residence during that time.  As a result, she dismissed the criminal trespass claim, noting even if she had found defendant trespassed, his conduct was "unaccompanied by violence or [a] threat of violence . . . to justify the issuance of an FRO."

The judge also dismissed the criminal mischief claim because the alleged damage to plaintiff's stereo occurred at a prior time and did not qualify as a predicate act of domestic violence.  The testimony showed "the stereo was not necessarily damaged[] but was somehow rendered unusable."

The trial judge found plaintiff proved the predicate act of stalking because defendant repeatedly interfered with her property by removing her belongings from the marital residence, including her bedroom.  Defendant removed plaintiff's vanity, jewelry holder, and photographs of plaintiff and her children. The judge found the removal of the photos "concerning" because defendant

knew one of the children had passed away. Defendant also removed patio furniture, a firepit, and "the bed remote leaving the bed in an upright position, so she couldn't sleep in the bed." The judge credited plaintiff's testimony she suffered emotional distress and was afraid to sleep in the master bedroom, even when defendant was not home. She also credited plaintiff's testimony defendant was trying to send her a message.

The trial judge found plaintiff proved a pattern of harassment pursuant to N.J.S.A. 2C:33-4(c). She found defendant: moving plaintiff's belongings around the house; turning the children's photos upside down; removing marital property from the house; selling a vehicle without telling plaintiff; sending her emails referencing her sinful behavior; printing out the article about the Catholic school teacher and leaving it for plaintiff to see; leaving a note on the doorframe of the master bedroom; installing a driveway sensor after plaintiff arrived at the house; installing cameras in the master bedroom and telling her he had a video of her which he would copyright; installing a camera in the window looking out onto the property; putting a lock on the master bedroom door knowing some of plaintiff's property was still in there, and she would not have access to it; keeping the computer locked so plaintiff could not use it; removing tools from the home so it could not be repaired; removing the bed remote and leaving it in an upright

23

position where it could not be slept in; locking the closet with some of her belongings in it; "allowing the chickens to pass away, when he was living at the home;" emailing about the dog; parking in plaintiff's spot in the driveway; and not giving her the house key for many months, "on their own would not be sufficient, but by looking at the history between the parties, and the new incidents since April of 2024 and putting them together, [there was] a pattern of conduct [the judge found] to be harassment with the intent to annoy, to upset, and to break down" plaintiff.

The judge observed "the house is central to the [parties'] arguments." However, defendant's conduct was continuous, escalating, and intended to "harass, upset, [and] alarm" plaintiff and "prevent her from being comfortable in her own home." Defendant's "excuses or explanations regarding his conduct" were not "reasonable."

"The past history of continued harassment, and the stalking concern[ed the judge]." Plaintiff

> testified to multiple incidents in the past, including[:] opening her mail; cashing checks in her name; withdrawing financial information from her; changing an account access to his name, so she didn't receive any information about that account; setting up a new internet system; locking the internet router in [defendant's] room; using the dog . . . to attempt to control her; bringing guns on to the property despite an

24

agreement not to do so; installing cameras in the home without her permission; installing [a] driveway sensor without her permission or knowledge.

The judge concluded plaintiff needed an FRO because the parties were in a contentious divorce, shared property, and "[t]here [we]re many steps for them to go through before these parties . . . completely, and legally parted ways." Given the continuing and escalating pattern of conduct, defendant "will continue to act in a manner to harass [plaintiff]." The judge cited her concern defendant kept guns on the property despite the agreement otherwise. She concluded plaintiff had "the right to feel safe, and to be at peace."

II.

On appeal, defendant argues the judge erred because there is nothing in the facts presented to support a finding of an intent to harass under N.J.S.A. 2C:33-4(c). When the trial judge dismissed plaintiff's prior complaint in 2023, she found the contact complained of was contretemps, and since that dismissal, the parties had little to no contact which could constitute harassment. Defendant reiterates the conduct plaintiff complains of is also contretemps.

Similarly, there was no evidence to support a finding of stalking under N.J.S.A. 2C:12-10(b). Plaintiff presented no evidence showing she suffered significant emotional distress or fear, or that the conduct complained of would

25

cause a reasonable person to suffer emotional distress or fear. Defendant argues the trial judge's finding plaintiff needed an FRO was erroneous because: she focused on the prior history, which she had previously found was not domestic violence; the predicate acts did not constitute domestic violence; and there was no evidence plaintiff was in immediate danger.

## III.

We typically owe deference to the Family Part's findings because of its special expertise in family matters. Cesare v. Cesare, 154 N.J. 394, 413 (1998). Reversal is required when a judge's factual findings "are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Deference is particularly strong when the evidence is largely testimonial and rests on a judge's credibility findings. Gnall v. Gnall, 222 N.J. 414, 428 (2015). No deference is owed to a trial judge's legal conclusions. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

## A.

A person commits stalking "if [they] purposefully or knowingly engage[] in a course of conduct directed at a specific person that would cause a reasonable

26

person to fear for [their] safety . . . or suffer other emotional distress." N.J.S.A. 2C:12-10(b). "Course of conduct" is defined as "directly, indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about, a person, or interfering with a person's property." N.J.S.A. 2C:12-10(a)(1). "Emotional distress" is "significant mental suffering or distress." N.J.S.A. 2C:12-10(a)(3). "Caus[ing] a reasonable person to fear" means "to cause fear which a reasonable victim, similarly situated, would have under the circumstances." N.J.S.A. 2C:12-10(a)(4).

Pursuant to the statute, we are constrained to reverse the trial judge's finding defendant committed stalking because she relied solely on plaintiff's subjective fears to determine whether plaintiff met the burden of proof. The judge did not address whether a reasonable, similarly situated person would be afraid as required by N.J.S.A. 2C:12-10(a)(4).

Notwithstanding the absence of these findings, our review of the facts does not support a finding of stalking. Defendant's conduct, whether the alleged predicate acts or history of domestic violence, does not convince us a reasonable person faced with the same conditions would be in fear. The parties' conduct

was a mutual "tit-for-tat" contretemps. For these reasons, the judge's finding of stalking was erroneous as a matter of law.

## B.

Harassment is committed when, "with purpose to harass another," a person "[e]ngages in any other course of alarming conduct or of repeatedly committed acts with [the] purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(c). Subsection (c) "requires proof of a course of conduct." J.D. v. M.D.F., 207 N.J. 458, 478 (2011). Purpose must also be proven and "supported by some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." Id. at 487. To "seriously annoy" means "to weary, worry, trouble[,] or offend." Id. at 478 (quoting State v. Hoffman, 149 N.J. 564, 581 (1997)). "[C]ourts must consider the totality of the circumstances to determine whether the harassment statute has been violated." Cesare, 154 N.J. at 404.

Fact-finding "is fundamental to the fairness of the proceedings and serves as a necessary predicate to meaningful review." R.M. v. Sup. Ct. of N.J., 190 N.J. 1, 12 (2007); see R. 1:7-4(a). "Naked conclusions do not satisfy the purpose of R[ule] 1:7-4. Rather, the trial court must state clearly its factual findings and

28

correlate them with the relevant legal conclusions." Curtis v. Finneran, 83 N.J. 563, 570 (1980).

Although we owe the trial judge's fact-findings deference, her decision turned on "some of the instances of lack of memory [defendant] had on cross [-]examination" and "the number of reasons or excuses . . . that he gave in response to the allegations of his conduct," which she found were not "reasonable." Our difficulty with this rationale is the judge never explained how defendant's failure to recall certain facts, what facts he failed to recall, or why the number of his explanations was unreasonable.

Having reviewed the testimony in the record, we cannot find a pivotal moment or moments where defendant's inability to recall a detail of the parties' lengthy history would convince us he committed the domestic violence offense of harassment. Indeed, defendant spent nearly three full days testifying and approximately half of that time answering a formidable cross-examination by plaintiff's attorney. The instances in which he could not recall a fact or event were not numerous. Moreover, his failure to recall a fact or event often related to the parties' divorce proceedings rather than the alleged domestic violence.

We reach a similar conclusion regarding the judge's rejection of "the number of reasons and excuses" given by defendant in response to the domestic

violence allegations. Although the judge found them to be unreasonable, she never identified what defendant said that she considered problematic or why the numerosity of his explanations was an issue. Indeed, the trial covered nearly every dispute the parties had during their marriage and divorce, which the judge conceded sounded of contretemps. Our review of the record does not convince us defendant did anything other than answer plaintiff's allegations. He rarely had to be directed by the court to answer plaintiff's counsel's questions, and in only a few instances did he give more than one explanation for his conduct, and those instances were not game changers. For these reasons, we reverse the harassment finding.

C.

Finally, because we reverse the findings of the predicate acts, we need not reach defendant's arguments about the findings related to plaintiff's need for an FRO.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0574-24